UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

Deborah C. Aumand
and Francis Coffey

      v.                                    Civil No. 06-cv-434-JL
                                              Opinion No. 2009 DNH 061
Dartmouth Hitchcock
Medical Center

**O R D E R**

The plaintiffs, who are the executor of the estate of
Katherine Coffey and Coffey's widower, Francis Coffey, have sued
Dartmouth Hitchcock Medical Center, alleging that it provided
negligent medical care to Coffey during her hospitalization
there, leading to an infection, the amputation of parts of her
hand, and ultimately her death.[1]  This court has jurisdiction
under 28 U.S.C. § 1332(a)(1) (diversity).  Each side has filed a
number of motions in limine seeking to exclude certain evidence
from the upcoming trial.  After oral argument, and for the
foregoing reasons, the court makes the following rulings on the
motions in limine.

---

[1]The court will refer to Katherine Coffey as "Coffey," and
Francis Coffey as "Francis Coffey."

I.   **Background**

The following facts are drawn from the allegations of the
plaintiffs' third amended complaint and their representations in
the motions themselves.  Coffey, who was seventy-eight years old
at the time, was discharged from Dartmouth Hitchcock following
successful coronary bypass surgery, but was readmitted two days
later complaining of shortness of breath.  Detecting low blood
sugar, hospital personnel proceeded to administer several doses
of glucose, or "D-50," to Coffey over a period of roughly six
hours, by way of a catheter inserted into her left hand.  After
the last of these administrations, however, hospital personnel
noted that her left hand appeared blue and swollen, so the
catheter was removed and replaced with one in her left elbow.

Coffey soon began complaining of numbness in her hand,
leading hospital personnel to believe that the glucose had
"infiltrated" or "extravasated," i.e., penetrated the tissue
outside of her veins.  Though Coffey was discharged from
Dartmouth Hitchcock approximately two weeks later, transferring
to Springfield Rehabilitation Center in Springfield, Vermont,
the condition of her left hand continued to deteriorate.  She was
readmitted to Dartmouth Hitchcock roughly one week later, when
two of her fingers and part of another on her left hand--which
had undergone mummification--were amputated.

After the surgery, Coffey reentered Springfield
Rehabilitation for about two weeks, during which both pus and
blood were observed draining from her wounds.  She also saw her
surgeon, who concluded that Coffey would need a skin graft to her
left hand.  That procedure, performed during a one-day visit to
Dartmouth Hitchcock, used skin harvested from Coffey's abdomen.

In two weeks, Coffey returned to Springfield Rehabilitation,
complaining of shortness of breath and dry heaves, followed by a
high fever, low blood pressure, and respiratory distress which
appeared after her admission.  Testing indicated a serious
infection, specifically methicillin-resistant staphylcoccus
areus, or MRSA, which the plaintiffs characterize as a bacterial
strain often contracted during hospital stays.  The next day,
Coffey died from a heart attack brought on by the infection.

Both the doctor who performed an autopsy, and another whom
the plaintiffs retained as an expert witness for this litigation,
identified the wounds from the amputation as the probable portal
of entry for the MSRA.  The plaintiffs claim that the amputation,
in turn, came about only as a result of Dartmouth Hitchcock's
alleged negligence during its treatment of Coffey's low blood
sugar during her first readmission to that hospital.

Specifically, the plaintiffs claim that Dartmouth Hitchcock
violated the standard of care by (1) failing to provide Coffey

3

with "appropriate nutrition," (2) "failing to fully inform the attending physician," (3) improperly administering glucose, particularly by (4) "pushing" it through the catheter into her hand, and (5) not recognizing promptly that the glucose had infiltrated and caused extravasation.  The third amended complaint asserts a medical malpractice claim on behalf of Coffey's estate, as well as loss of consortium claim on behalf of Francis Coffey; a third claim, for negligent infliction of emotional distress on behalf of Francis Coffey, has been voluntarily dismissed.  Dartmouth Hitchcock denies any deviation from the standard of care, or any link between its actions and Coffey's injuries, up to and including her death.

## II.  **Analysis**

### A.    **Plaintiffs' motion "regarding infiltration/extravasation"**

The plaintiffs seek to prevent Dartmouth Hitchcock from asserting at trial that Coffey did not, in fact, experience infiltration of the glucose, arguing that the hospital has not disclosed any expert testimony to that effect.  In response, Dartmouth Hitchcock explains that, while it does not intend to proffer such expert testimony, it nevertheless remains free to present other kinds of evidence tending to suggest than no

4

infiltration occurred, as well as to question whether the plaintiffs have carried their burden to prove otherwise.

Dartmouth Hitchcock has the better of this argument.  While New Hampshire law requires expert testimony to prove the essential elements of a medical malpractice case, i.e., the standard of care, a breach of that standard, and causation, N.H. Rev. Stat. Ann. ("RSA") § 507-E:2, it does not follow that a party to such a case cannot take a position on what did or did not occur as a factual matter without expert testimony affirmatively supporting that position.[2]  The only limit on the positions a party can take--as distinguished from the evidence a party can introduce--would seem to be the general rule against "arguments prejudicial to the opposing party which are not supported by facts in evidence, or which are beyond the limits of fair or sound argument, unduly influencing or distracting the

---

[2]The plaintiffs cite the New Hampshire Supreme Court's recent decision in Goudreault v. Kleeman, 965 A.2d 1040 (N.H. 2009), but it is not to the contrary.  In relevant part, Goudreault holds only that, in order for the jury in a medical malpractice case to consider "apportioning professional liability" to non-parties, a defendant must affirmatively show the negligence of those non-parties by expert testimony in accordance with RSA 507-E:2.  Id. at 1057.  It does not hold that a medical malpractice defendant must adduce expert testimony to support any position it takes at trial.

jury."[3]  75 Am. Jur. 2d <u>Trial</u> § 414, at 632 (2007) (footnote omitted).

　　Dartmouth Hitchcock's anticipated arguments do not fit that description.  Based on the evidence cited in its objection to this motion, Dartmouth Hitchcock has a factual basis to argue that no infiltration occurred.  And, even without that evidence, Dartmouth Hitchcock remains free to argue that the plaintiffs have not carried their burden to show that infiltration did occur.  Indeed, at oral argument, the plaintiffs more or less withdrew this motion, characterizing it as simply an attempt to prevent Dartmouth Hitchcock from offering undisclosed expert testimony that Coffey did not experience infiltration or extravasation of the glucose, which is a different matter treated by a different motion in limine.  <u>See</u> <u>infra</u> Part II.E.  On its face, this motion requests much broader relief, but in any event it is denied.

---

[3]There is a similar prohibition, of course, on asking a question on cross-examination without "a good-faith basis in fact for the inquiry," because "[t]he asking of the leading question and the denial carry a harmful innuendo which is unsupported by any evidence."  1 <u>McCormick on Evidence</u> § 39, at 171 & n.6 (Kenneth S. Broun, <u>et al.</u>, eds., 6th ed. 2006).  This rule is implicated by the plaintiffs' third motion in limine.  <u>See</u> <u>infra</u> Part II.C.

**B.   Plaintiffs' motion to exclude references to their amending their complaint**

The plaintiffs seek to prevent Dartmouth Hitchcock "from making any reference to the fact that [their] Complaint in this case was amended" to allege additional theories of negligence not set forth in prior versions of the complaint.  Though statements in a pleading are admissible against the pleader as admissions by a party-opponent, see Fed. R. Evid. 801(d)(2), even if the pleading has since been amended to delete them, this court has in a prior case disallowed their use to impeach the pleader's credibility on the theory that his or her allegations have changed over time.  See L'Etoile v. New Eng. Finish Sys., Inc., 575 F. Supp. 2d 331, 339-40 (D.N.H. 2008).

As this court reasoned, because pleadings are often amended for reasons unrelated to the accuracy or completeness of the prior allegations, the fact of amendment is usually not probative of the pleader's credibility, but the introduction of that fact "carries significant risk of undue delay and waste of time as the jury hears rebuttal evidence" explaining the reason for the amendment.  Id.  So evidence that a pleading was amended should generally be excluded under Rule 403, at least if offered to impeach the pleader's credibility.  See id.; see also Mason v. Texaco, Inc., 741 F. Supp. 1472, 1498 (D. Kan. 1990) (disallowing

7

the use of prior pleadings to cross-examine plaintiff because "clients will rarely, if ever, be in a position to explain the legal theories and strategies chosen by their lawyers"), aff'd, 948 F.2d 1546 (10th Cir. 1991).

Dartmouth Hitchcock, however, has disclaimed any intent to use the fact of amendment for that purpose.  Instead, Dartmouth Hitchcock suggested that it may use prior versions of the complaint in cross-examining witnesses who relied on prior versions of the complaint in giving prior testimony in this matter, including by referring to the complaint in an interrogatory answer.  Those strike the court as uses of the prior pleading, rather than the fact of amendment, which in any event do not appear to implicate the witness's credibility.  At this point, then, the court cannot prohibit the use of prior versions of the complaint for all purposes.  Accordingly, this motion is granted insofar as Dartmouth Hitchcock must approach the bench with an appropriate proffer before referring to earlier versions of the complaint or the fact they were amended.

C.   **Plaintiffs' motion to exclude the conclusion of one of Coffey's treating physicians**

The plaintiffs seek to exclude any reference to the conclusion, set forth in a note authored by Dr. Susan Lemei, a

physician who saw Coffey at Springfield Hospital the day before she died, that "[h]er wounds do not appear to be the origin of her infection."  The plaintiffs say that, because Lemei "was wrong in assuming that Mrs. Coffey's hand was not infected"--at least according to their view of the case--the conclusion should be excluded under Federal Rules of Evidence 401, 403, and 702. But the plaintiffs have already agreed to the admissibility of this note (as well as all Coffey's medical records from the relevant period), so any such objections are waived.  Having made such an agreement, the plaintiffs cannot prevent Dartmouth Hitchcock from "referring" to the note, because a party's trial presentation may incorporate any evidence in the record.  <u>See</u>, <u>e.g.</u>, <u>United States v. Ortiz</u>, 447 F.3d 28, 35 (1st Cir. 2006).

Moreover, the plaintiffs' objections are misplaced anyway. The conclusion of a doctor who examined Coffey the day before she died is plainly relevant under Rule 401.  And, whether the infection entered through Coffey's hand or some other portal is a crucial issue in the case, so the conclusion has significant probative value that outweighs any countervailing concerns under Rule 403; though the plaintiffs complain that the conclusion is "wrong" or "misleading," they can make those points to the jury, including through the testimony of their own expert, who believes

the infection entered through the hand and will presumably explain why he holds that belief despite Lemei's observation.

As to the plaintiffs' Rule 702 objection, most authorities take the view that a party offering a document admissible as a "report of regularly conducted activity" under Rule 803(6) (covering a "memorandum, report, record . . . of acts, events, conditions, opinions, or diagnoses")--as medical records generally are, see Fed. R. Evid. 803(6) advisory committee's note (1972)--need not also show, under Rule 702, the qualifications of the document's author to render any opinions in the report.  See, e.g., Forward Commc'ns Corp. v. United States, 608 F.2d 485, 510 (Ct. Cl. 1979); United States v. Licavoli, 604 F.2d 613, 622-23 (9th Cir. 1979); 2 McCormick on Evidence, supra, § 287, at 307 n.10; but see 5 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence § 803.08[6][c], at 803-70 (Joseph G. McLaughlin, ed., 2d ed. 1999 & 2004 supp.) (noting that a conclusion in a report admissible under Rule 803(6) may be excluded under Rule 702).  Instead, to exclude the opinion, the adverse party bears the burden to show that "the source of information or the method or circumstances of preparation lack trustworthiness," as provided by Rule 803(6) itself.  See Licavoli, 604 F.2d 622-23.

10

The plaintiffs have not done that; nor have they shown, for
that matter, that Lemei was unqualified under Rule 702 to give an
opinion as to whether Coffey's hand appeared infected.  <u>Cf.
Ricciardi v. Children's Hosp. Med. Ctr.</u>, 811 F.2d 18, 23 (1st
Cir. 1987) (upholding exclusion of doctor's note describing
incident during surgery where doctor's basis for knowing about
the incident was unknown, despite Rule 803(6), because "[a]n
unknown source is hardly trustworthy").  So far as the report
itself indicates, Lemei is a hospitalist, i.e., a physician who
treats hospitalized patients, who based her assessment of Coffey
on the results of a physical examination and laboratory work.
This motion is denied.[4]


**D.   Plaintiffs' motion to exclude reference to the hypoglycemia
      policy of Mercy Hospital**

The plaintiffs seek to prevent Dartmouth Hitchcock from
referring to the written policy of Mercy Hospital (located in
Portland, Maine, and not the site of any of the treatment at
issue in this case) for treating patients with hypoglycemia.

----

[4]At oral argument, the plaintiffs pointed out that Dartmouth
Hitchcock cannot call Lemei to testify to her conclusion because
she was not disclosed as an expert witness under Fed. R. Civ. P.
26(a)(2)(A).  That is correct, <u>see</u> <u>infra</u> Part II.E, but Dartmouth
Hitchcock disclaimed any intention to call Lemei in any event.

When the plaintiffs' claims in this case were heard before a
medical malpractice screening panel as required by New Hampshire
law, RSA 519-B, counsel for Dartmouth Hitchcock referred to the
policy in cross-examining one of the plaintiffs' expert
witnesses, making a representation as to the dictates of the
policy in a particular situation.  The plaintiffs object to use
of the same tactic at trial because Dartmouth Hitchcock has never
given them a copy of the policy--though they asked to see it
during the proceedings before the panel--leaving them in the dark
as to what the policy actually provides.

    "In the interests of justice and fairness, counsel may be
required to produce for examination by opposing counsel writings
used to cross-examine a witness."[5]  98 C.J.S. <u>Witnesses</u> § 491, at
462 (2002).  Those sorts of interests require Dartmouth Hitchcock
to produce a copy of Mercy Hospital's hypoglycemia policy to the
plaintiffs before using it for cross-examination or otherwise
referring to it at trial.  At oral argument, counsel for
Dartmouth Hitchcock suggested that, because he obtained a copy of

---

[5]Similar interests are served by the rule, codified as Rule
613(a) of the Federal Rules of Evidence, that "[i]n examining a
witness concerning a prior statement made by the witness . . .
the statement need not be shown nor its contents disclosed to the
witness at that time, but on request the same shall be shown or
disclosed to opposing counsel."  <u>See</u> 1 <u>McCormick on Evidence</u>,
<u>supra</u>, § 28, at 130-31.

the policy through his own efforts, it was protected by the work
product doctrine, but that notion is incorrect.  First, as the
language of Rule 26(b)(3)(A) of the Federal Rules of Civil
Procedure indicates, "[m]aterials assembled during routine
investigation by counsel do not receive the qualified immunity
afforded an attorney's work product."  10 <u>Federal Procedure:</u>
<u>Lawyers Edition</u> § 26:184, at 573 (2007); <u>see also</u> <u>United States</u>
<u>v. Fort</u>, 472 F.3d 1106, 1118 n.13 (9th Cir.), <u>cert. denied</u>, 128
S. Ct. 375 (2007); <u>In re Grand Jury Subpoenas</u>, 318 F.3d 379, 384-
85 (2d Cir. 2003).

     Second, even if the policy had been privileged, counsel
waived it by disclosing the contents of the document to the
plaintiffs' witness during the panel proceeding.  <u>See</u> <u>United</u>
<u>States v. Nobles</u>, 422 U.S. 225, 239-40 (1975); 10 <u>Federal</u>
<u>Procedure:  Lawyers Edition</u>, <u>supra</u>, § 26:232, at 615.  To allow
Dartmouth Hitchcock to question the plaintiffs' witnesses about
the policy without disclosing it, then, would "sustain a
unilateral testimonial use of work-product materials" as a sword,
rather than a shield (assuming, <u>dubitante</u>, that the policy is
"work product" in the first place).  <u>Nobles</u>, 422 U.S. at 240.
This motion is granted:  Dartmouth Hitchcock shall not refer to

the Mercy Hospital hypoglycemia policy without first producing it
to the plaintiffs.[6]

### E.   Plaintiffs' motion to exclude expert testimony from physicians not disclosed as experts

The plaintiffs move to preclude any expert testimony from a
number of physicians who treated Coffey, arguing that Dartmouth
Hitchcock failed to disclose them as expert witnesses in a timely
fashion.  In their proposed discovery plan, submitted under Rule
26(f) of the Federal Rules of Civil Procedure and later approved
by the court, the parties agreed to

> make a good faith disclosure of expert opinions and the
> basis thereof . . . .  The parties opt out of the
> formal requirements of Fed. R. Civ. P. 26(a)(2).
> Expert witness designations need not be authored and
> signed by the experts but need only contain the
> identity of the expert, his qualifications, opinions,
> and the basis and reasons for those opinions.[7]

The parties ultimately agreed to a deadline of June 1, 2008, for
Dartmouth Hitchcock to provide this information.

As contemplated by the discovery plan, Dartmouth Hitchcock
provided the plaintiffs with individual expert disclosures as to

---

[6]The plaintiffs also argue that the policy is irrelevant
because, if it says what Dartmouth Hitchcock's counsel
represented it to say, it would not have applied to Coffey's
situation anyway.  The court cannot resolve that objection before
receiving evidence on Coffey's situation and seeing the policy.

[7]See document no. 6.

its retained experts on nursing standards of care and infectious diseases, and a "reservation . . . with respect to potential expert witnesses," in June 2008.  The "reservation" listed a number of nurses who had not been retained as experts, but "whose testimony as percipient witnesses also reveals expertise that may be germane to the issues in the case and may be helpful to the jury" by virtue of having cared for Coffey during her treatment at Dartmouth Hitchcock.

But it was not until April 2, 2009, when Dartmouth Hitchcock filed its final pre-trial statement under Rule 26(a)(3) and Local Rule 16.2, that it disclosed a number of physicians who also treated Coffey during her hospitalization.  The plaintiffs argue that, given this untimely disclosure, these physicians cannot offer any expert testimony at trial.  There is no question that, because these physicians were neither "retained or specially employed to provide expert testimony in the case" nor have "duties as [Dartmouth Hitchcock's] employee[s] [that] regularly involve giving expert testimony," they are not subject to Rule 26(a)(2)(B), which by its terms requires an expert report (but in this case, due to the provision in the discovery plan, required only the specified "expert witness designation").  See Fed. R. Civ. P. 26(a)(2) advisory committee's note (1993); Sprague v. Liberty Mut. Ins. Co., 177 F.R.D. 78, 81 (D.N.H. 1998).

The plaintiffs maintain, however, that Dartmouth Hitchcock was required to disclose these treating physicians as expert witnesses under Rule 26(a)(2)(A).  That is correct, as this court has previously observed.  "While all experts must be disclosed under Rule 26(a)(2)(A), only 'retained' experts must provide Rule 26(a)(2)(B) reports."  <u>Sprague</u>, 177 F.R.D. at 81.  In response, Dartmouth Hitchcock argues (aside from a generalized, and inadequate, plea that it "should be able to defend itself through the testimony of its employees") that testimony from treating physicians is not expert testimony unless it is "hypothetical," e.g., their opinions on whether other professionals met the standard of care.  The court disagrees.

Rule 26(a)(2)(A) is clear:  its disclosure requirement applies to "any witness [a party] may use at trial to present evidence under Federal Rule of Evidence 702, 703, or 705."  Rule 702, in turn, provides in relevant part that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise."  This encompasses a treating physician's diagnoses, prognoses, or other conclusions as to the patient's condition, because those are examples of the physician's

16

"specialized knowledge"--indeed, it is to take advantage of that specialized knowledge that laypeople ordinarily seek the advice of physicians and other medical professionals.  So this court takes the view that, when the parties have not agreed otherwise, a treating physician may not testify to such matters unless he or she has been disclosed under Rule 26(a)(2)(A).[8]  See Musser v. Gentiva Health Servs., 356 F.3d 751, 758 (7th Cir. 2004); Redfoot v. B.F. Ascher & Co., No. 05-2045, 2007 WL 1593239, at *13 (N.D. Cal. June 1, 2007); Mealing v. City of Ridgefield, Wash., No. 05-5778, 2007 WL 1367603, at *1 (W.D. Wash. May 8, 2007); Garza v. Roger Henson Trucking L.L.C., No. 05-5001, 2006 WL 1134911, at *3 (D. Neb. Apr. 26, 2006); see also Vigilant Ins. Co. v. E. Greenwich Oil Co., 234 F.R.D. 20, 22-23 (D.R.I. 2006) (rejecting the view that "non-retained testifying experts" need not be disclosed under Rule 26(a)(2)(A)).

At oral argument, Dartmouth Hitchcock sought to characterize a treating physician's testimony as to diagnoses and the like as lay opinion testimony admissible under Rule 701, instead of expert opinion testimony admissible under Rule 702.  Rule 701,

---

[8]Again, this is to be distinguished from the issue of whether a treating physician can testify to such matters without timely submitting an expert report under Rule 26(a)(2)(B), see, e.g., Vosburgh v. Bourassa, 2008 DNH 133, 5-8, because the plaintiffs do not argue that Rule 26(a)(2)(B) applies to any of the treating physicians at issue.

however, allows lay testimony as to "opinions and inferences" only if, among other restrictions, they are "not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701(c). This limitation, added to the rules in 2000, "makes clear that any part of a witness' testimony that is based upon scientific, technical, or other specialized knowledge within the scope of Rule 702 is governed by the standards of Rule 702 and the corresponding disclosure requirements of the Civil and Criminal Rules." Id. advisory committee's note (2000).

Again, it cannot be seriously disputed that a treating physician's diagnoses, prognoses, or similar conclusions as to the patient's condition are "based upon scientific, technical, or other specialized knowledge," and, as such, are outside the scope of Rule 701--and inside the scope of Rule 26(a)(2)(A). As one court has observed, the view "that a treating physician is not even an expert witness subject to disclosure under Rule 26(a)(2)(A) to the extent his testimony relates to his personal observations with a plaintiff/patient prior to the litigation . . . has been superseded by the 2000 amendments to Fed. R. Evid. 701 and the advisory committee notes."[9] Kirkham v. Societe Air

---

[9]The one case on which Dartmouth Hitchcock relies, United States v. Henderson, 409 F.3d 1293 (11th Cir. 2005), acknowledges

<u>Fr.</u>, 236 F.R.D. 9, 11 n.2 (D.D.C. 2006).  This is not to say, of course, that, in the absence of a Rule 26(a)(2)(A) disclosure, treating physicians cannot testify as to, as Dartmouth Hitchcock puts it, "what they saw and what they did" in the course of caring for a patient; that would be fact testimony, rather than opinion testimony under Rule 702.  But going beyond those facts triggers the disclosure requirement, which Dartmouth Hitchcock disregarded when it failed to designate the treating physicians as expert witnesses by the agreed-upon deadline.

Having failed "to identify [] witness[es] as required by Rule 26(e)(2)," Dartmouth Hitchcock is "not permitted to use that . . . witness . . . at a trial, unless the failure was substantially justified or is harmless."  Fed. R. Civ. P. 37(c)(1).  But "it is the obligation of the party facing

---

the 2000 amendment to Rule 701, but goes on to cite pre-amendment authority to support its view that a treating physician's testimony as to her diagnosis of the patient as having a broken jaw "would be permissible lay testimony" under the rule, while concluding that her testimony as to the likely cause of that injury would not be.  <u>Id.</u> at 1300.  The <u>Henderson</u> court's view as to the admissibility of the diagnosis was dicta, because there was no objection to that part of the testimony, but this court disagrees with that view insofar as it suggests that a physician's diagnosis of a patient ordinarily qualifies as a lay opinion under Rule 701.  That said, there may be some diagnoses so obvious that a physician can make without resorting to his or her specialized knowledge--a common cold might be one example, and perhaps a broken jaw is another--but the court need not resolve that issue here because Coffey's condition was not of that nature.

19

sanctions for belated disclosure to show that its failure to comply with the Rule was either justified or harmless." Wilson v. Bradlees of New Eng., Inc., 250 F.3d 10, 21 (1st Cir. 2001).

Here, Dartmouth Hitchcock has not even ventured an argument that its non-disclosure of the treating physicians as experts was either substantially justified or harmless. A substantial justification argument would not work, anyway, because Dartmouth Hitchcock's careful "reservation" of its rights to call any of the nurses who treated Coffey as "potential expert witnesses" demonstrates that it fully appreciated its obligation to disclose under Rule 26(a)(2)(A) those "whose testimony as percipient witnesses also reveals expertise that may be germane to the issues in the case."

A colorable harmlessness argument is easier to envision, on the theory that the plaintiffs and their counsel have long known the identity of the treating physicians and their opinions through access to Coffey's medical records, making a Rule 26(a)(2)(A) disclosure a mere formality. Cf. Sprague, 177 F.R.D. at 81 (noting that "unretained experts, who formed opinions from pre-litigation observation, invariably have files from which any competent trial attorney can effectively cross-examine" them). Again, though, it is Dartmouth Hitchcock's burden to present such an argument, and it has not. So the court takes at face value

the plaintiffs' complaint that, had they known Dartmouth
Hitchcock intended to elicit opinion testimony from the treating
physicians, their depositions would have been sought but now, on
the eve of trial, it is too late.

Finally, though Rule 37(c)(1) authorizes other sanctions
"instead of" excluding undisclosed witnesses, it nevertheless
"requires the near automatic exclusion of Rule 26 information
that is not timely disclosed," placing the burden on the non-
disclosing party to show that some lesser sanction is
appropriate.  <u>Wilson</u>, 250 F.3d at 20-21.  Dartmouth Hitchcock,
again, has not taken on that burden here, but in any event none
of the other sanctions (e.g., ordering the payment of attorneys'
fees caused by the nondisclosure, or informing the jury of it) is
appropriate.  Accordingly, the motion is granted insofar as it
seeks to preclude the treating physicians from offering any
opinion testimony, as defined by Rule 702.


**F.   Dartmouth Hitchcock's motion for a ruling on the value of
       medical services**

Dartmouth Hitchcock asks the court to rule that the
reasonable value of medical services in this case, as an element
of the damages to Coffey's estate, is the amount paid in full
satisfaction of her medical bills, rather than the face amount of

the bills themselves.  Dartmouth Hitchcock represents that, while it billed Coffey more than $73,000 for its services, it accepted only about $28,500 in full satisfaction of those charges from Medicare and Coffey's supplemental insurer.  Dartmouth Hitchcock argues that allowing Coffey's estate to recover more than the approximately $28,500 actually paid would bestow a windfall in contravention of "first principles" that a damage award put the plaintiff in the same, not a better, position that it would have been but for the defendant's allegedly tortious conduct.

As the parties recognize, this court rejected essentially the same argument in Williamson v. Odyssey House, Inc., 2000 DNH 238 (DiClerico, J.), denying a motion in limine "to exclude evidence of the billed cost of medical services . . . and to limit the evidence of damages for medical expenses to the amounts actually paid by Medicaid."  Id. at 1.  Judge DiClerico ruled that "[i]n light of New Hampshire's collateral source rule and the standard for the measure of damages for medical costs . . . the reasonable value of medical services . . . is the proper measure of damages, regardless of the amount paid for those services by Medicaid."  Id. at 3.  This court sees no reason to reach a different conclusion here.

As this court explained in Williamson, New Hampshire's collateral source rule provides that, "'if a plaintiff is

compensated in whole or part for his damages by some source independent of the tort-feasor, he is still permitted to make full recovery against [the tort-feasor].'" Id. at 2 (quoting Moulton v. Groveton Papers Co., 114 N.H. 505, 509 (1974)).  One purpose of this rule, as Williamson recognized, is "to prevent a windfall to the defendant tortfeasor, who would otherwise profit from benefits provided by a third party to the injured party." Id. (citing Carson v. Maurer, 120 N.H. 925, 940 (1980)). Dartmouth Hitchcock argues that the rule nevertheless produces a windfall--to the injured party, who usually pays little if anything out-of-pocket toward his or her medical bills because they have been paid by government or private insurance.[10]

The collateral source rule, however, dictates that this windfall should go to the injured plaintiff, rather than the tortfeasor defendant.  Indeed, where third-party payments have reduced the plaintiff's net loss, "to the extent the defendant is

---

[10]The insurer who pays the bills, of course, generally has a lien against any recovery for the related injuries from the third party who caused them.  See, e.g., Ark. Dep't of Health & Human Servs. v. Ahlborn, 547 U.S. 268, 280-92 (2006) (discussing states' ability to recover Medicaid payments occasioned by third-party torts).  So the unstated premise of Dartmouth Hitchcock's argument is that, because Coffey's insurers cannot recover any more than what they actually paid from her estate--and it was only her insurers, rather than her estate, who paid anything--her estate should be able to recover no more than what the insurers actually paid.

required to pay the total amount there may be double compensation . . . . But it is the position of the law that a benefit that is directed to the injured party should not be shifted so as to become a windfall for the tortfeasor." Restatement (Second) of Torts § 920 cmt. b, at 514 (1977). New Hampshire, like the majority of jurisdictions, adheres to this policy choice. This court, in applying New Hampshire law, is obviously not free to choose differently.

Dartmouth Hitchcock protests that "because the billed amount is an illusory charge with no relationship to the cost or value of medical services," a damages award based on the sum of the plaintiffs' bills, rather than the sum paid in satisfaction of them, does not reflect "'the reasonable value of past and future medical care,'" which, as Williamson observed, is the proper measure of that element of damages in a tort case. 2000 DNH 238, at 2 (quoting and adding emphasis to Johnston v. Lynch, 133 N.H. 79, 92 (1990)). As an alternative to simply ruling that the medical expenses equal the payment, then, Dartmouth Hitchcock proposes that, in order to rectify this problem, it should be allowed to introduce the evidence of what it was paid in satisfaction of Coffey's bills as "the value of the services as represented by the market."

24

That strikes the court as an end-run around the collateral source rule, as a number of courts have concluded in upholding the exclusion of what a third party paid toward medical expenses as evidence of their value.  See Goble v. Frohman, 848 So. 2d 406, 410 (Fla. Dist. Ct. App. 2003), aff'd, 901 So. 2d 830 (Fla. 2005); Wills v. Foster, 892 N.E.2d 1018, 1033 (Ill. 2008); Covington v. George, 597 S.E.2d 142, 144 (S.C. 2004); Papke v. Harbert, 738 N.W.2d 510, 536 (S.D. 2007); Radvany v. Davis, 551 S.E.2d 347, 348 (Va. 2001); Leitinger v. DBart, Inc., 736 N.W.2d 1, 13-14 (Wis. 2007); but see Robinson v. Bates, 857 N.E.2d 1195, 1200 (Ohio 2006).  These courts have generally reasoned that, while evidence of what was actually paid in satisfaction of the bills has some probative force as to the value of the plaintiff's medical expenses, the risk is simply too great that the jury will improperly subtract those payments from the plaintiff's recovery in violation of the collateral source rule.[11]  See Goble, 848 So.

---

[11]In a similar vein, a number of courts have ruled that evidence of the fact of payments from a third-party is inadmissible to show that the plaintiff was "malingering," i.e., putting off returning to work following the injury at issue, based on the risk that the jury will misuse the evidence to reduce the plaintiffs' damages in violation of the collateral source rule.  See, e.g., Eichel v. N.Y. Cent. R.R. Co., 375 U.S. 253, 254-55 (1963); Proctor v. Castelletti, 911 P.2d 853, (Nev. 1996); Reinan v. Pac. Motor Trucking Co., 527 P.2d 256, 258-59 (Or. 1974) (citing cases).

25

2d at 410; <u>Wills</u>, 892 N.E.2d at 1033; <u>Covington</u>, 597 S.E.2d at
144; <u>Leitinger</u>, 736 N.W.2d at 13.

That mode of analysis comports with the view of the court of
appeals that the collateral source rule has an evidentiary
component, i.e., proof of third-party payments to the plaintiff
as compensation for his or her injuries is generally
inadmissible, and a substantive component, i.e., such payments
have no effect on the defendant's liability.  See <u>Fitzgerald v.</u>
<u>Expressway Sewerage Constr., Inc.</u>, 177 F.3d 71, 73 (1st Cir.
1999).  So, under the <u>Erie</u> doctrine, <u>Erie R.R. Co. v. Tompkins</u>,
304 U.S. 64, 78 (1938), a federal court exercising its diversity
jurisdiction is bound to apply the rule's substantive component,
but effects the rule's evidentiary component by applying the
Federal Rules of Evidence, particularly Rule 403.  <u>See</u>
<u>Fitzgerald</u>, 177 F.3d at 74.  In this regard, the court of appeals
has recognized that, while collateral source evidence may have
some probative worth in particular circumstances, it "almost
inevitably creates a risk that a jury, informed, say that a
plaintiff has recourse to first-party insurance proceeds, may be
unduly inclined to return either a defendant's verdict or an
artificially low damage award."  <u>Id.</u> at 75.[12]

_____

[12]The court in <u>Fitzgerald</u> in fact upheld the admission of
proof of health insurance payments to the plaintiffs, but only

In accord with that observation, and the many state court decisions just discussed, this court concludes that the significant risk of unfair prejudice to Coffey's estate from proof of what her insurers actually paid to settle her medical bills--that is, that the jury may improperly reduce any award to the estate--substantially outweighs any probative value of that proof to the value of the care she received. See Fed. R. Evid. 403. Dartmouth Hitchcock's motion is denied, and it shall not offer evidence of what it, or any other provider, accepted as payment in full for its charges to Coffey.[13]

---

after one of them testified that the medical expenses resulting from the injuries at issue had exerted a financial strain. 177 F.3d at 75. The court ruled that the district court had not abused its discretion by allowing proof of the payments for the limited purpose of rebutting that testimony, on the theory that the plaintiffs had opened the door. Id. at 75-76. Subject to potential developments at trial, however, that aspect of Fitzgerald is inapplicable here. See England v. Reinauer Transp. Cos., 194 F.3d 265, 274 (1st Cir. 1999) (distinguishing Fitzgerald, and upholding the exclusion of evidence of insurance payments, where plaintiff's testimony "was not sufficient to imply that he was suffering such financial difficulties as to negate impliedly the receipt of any additional benefits").

[13]Disallowing evidence of third-party payments for this purpose does not prevent Dartmouth Hitchcock from using other methods of questioning the face amounts of the medical bills as equivalent to the reasonable value of Coffey's medical expenses. See, e.g., Covington, 597 S.E.2d at 145. Of course, that puts Dartmouth Hitchcock in the somewhat delicate position of arguing to the jury--as it did in support of this motion--that its own bills have "no relationship to the cost or value of medical services."

**G.   Dartmouth Hitchcock's motion to exclude hearsay statements**

Finally, Dartmouth Hitchcock seeks to preclude evidence of two statements allegedly made to members of Coffey's family by its employees.  Dartmouth Hitchcock argues that these statements are hearsay because the plaintiffs cannot show the predicate for introducing them as admissions under Rule 801(d)(2).  The plaintiffs respond that they have done just that, at least as to one of the statements, and that they are offering the other statement not for its truth, but for the emotional distress it caused Coffey and her husband upon hearing it.

**A.   The statement to James Coffey**

The first statement was allegedly made to Coffey's son, James, by a man he encountered upon leaving his mother's hospital room at Dartmouth Hitchcock after she had received the injections of glucose, or "D-50."  James, who was concerned about the appearance of his mother's hand, asked this "fellow," whom he met in the corridor near the nurse's station, whether he had seen or touched the hand.  According to James's deposition testimony, the man told him "it was an injection of D-50 into the tissue of her hand.  Someone had made a mistake.  He had never seen anything like it."  But, save for a less-than-certain memory that the man was about the same height as him, James could not recall anything

28

about the man's appearance, such as his hair color, clothing, the characteristics of his voice, or what he was holding or doing at the time.  James "just thought he was a nurse, or a physician's assistant, or something because he was the one I met."

The plaintiffs say that the man's statement to James is admissible as an admission by a party-opponent under Rule 801(d)(2), sections (A), (C), and (D).  They do not explain, however, how the comment is "the party's own statement, in either an individual or a representative capacity" under section (A) or "a statement by a person authorized by the party to make a statement concerning the subject" under section (C), and neither of those provisions seems to apply, so the court will not consider them.  See United States v. Gaines, 170 F.3d 72, 79 (1st Cir. 1999).  The plaintiffs' real argument is that the man's comment to James is "a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship" under Rule 801(d)(2)(D).  Dartmouth Hitchcock objects that, in light of James's inability to recall anything about the man who made the statement, the plaintiffs cannot show that he even was the hospital's employee, let alone that the subject of the statement, Coffey's condition, was within the scope of any such employment.

The proponent of a statement as an admission by an agent within the scope of his employment bears the burden of showing both the existence and scope of the relationship.  See Bacou Dalloz USA, Inc. v. Cont'l Polymers, Inc., 344 F.3d 22, 29 n.4 (1st Cir. 2003).  These predicates may be shown by circumstantial evidence, so long as the evidence is more than simply the statement itself.  See, e.g., Pappas v. Middle Earth Condo. Ass'n, 963 F.2d 534, 538 (2d Cir. 1992); 4 Stephen A. Salzburg et al., Federal Rules of Evidence Manual § 801.02[6][f][iv], at 801-48--801-49 (9th ed. 2006); accord Woodman v. Haemonetics Corp., 51 F.3d 1087, 1094 (1st Cir. 1995) (ruling that statement proffered under Rule 801(d)(2)(D) was erroneously excluded given circumstantial evidence that it concerned matters within the scope of the declarant's employment).  Furthermore, this evidence need not include proof positive of the declarant's identity; as one court has put it, "a name is not in all cases required." Davis v. Mobil Oil Exploration & Producing Se., Inc., 864 F.2d 1171, 1174 (5th Cir. 1989); see also Pappas, 963 F.2d at 538.

Here, as the plaintiffs suggest, James's testimony provides adequate circumstantial evidence that the declarant, first, was an employee of Dartmouth Hitchcock and, second, that the statement concerned a matter within the scope of his employment. James recalled that the man was standing in the corridor near the

nurse's station and, when asked whether he knew about Coffey's
hand, gave a response that indicated not only some specific
knowledge of that subject, i.e., that she had received an
injection of a particular substance, but also the basis of that
knowledge, i.e., that he had actually seen the hand, because he
had "never seen anything like it."  It is difficult to imagine
that such things would be known or seen by a person whose job did
not include knowing or seeing them, let alone a person who was
not even employed by the hospital.  See Pappas, 963 F.2d at 538
(rejecting as "fanciful and unpersuasive" the notion that a
declarant who had "arrived carrying appropriate implements for
ice removal" following a call to defendant complaining about an
icy sidewalk was not authorized to maintain the sidewalk).

A number of courts have found similar circumstantial
evidence of an employment relationship and its scope sufficient
to allow the admissibility of an otherwise unidentified
declarant's statement under Rule 801(d)(2)(D).  See Pappas, 963
F.2d at 538; Fitzpatrick v. Home Depot U.S.A., Inc., No. 06-3624,
2007 WL 2071894, at *1 (E.D. Pa. July 18, 2007) (ruling that
plaintiff's identification of the declarant as "standing among a
group of five to seven employees" near the checkout corner and
wearing the color of the store's typical uniform sufficed to
admit his statement acknowledging a dangerous condition there);

31

Becton v. Starbucks Corp., 491 F. Supp. 2d 737, 740-41 (S.D. Ohio
2007) (allowing an apologetic statement from a woman who
identified herself as a manager where her conduct in attending to
plaintiff's mishap "clearly supports a finding that she worked
for [defendant] and was acting in the scope of her employment
when she made the statement"); Miller v. TGI Friday's, Inc.,
No. 05-6445, 2007 WL 723426, at *4 (C.D. Ill. Mar. 5, 2007)
(admitting plaintiff's testimony that she overheard a
restaurant's hostess saying "they should have cleaned up the
stair" where the fact that the hostess had seated the plaintiff
provided circumstantial evidence of her duty to help keep the
floor clean); Bibbs v. Newman, 997 F. Supp. 1174, 1181-82 (S.D.
Ind. 1998) (admitting statement from unidentified subordinates in
an employment discrimination case because "the subject matter of
the statements is sufficient to show they would have been made
within the scope of [their] employment").  In line with these and
like authorities, the court concludes that the plaintiffs have
proffered adequate evidence to submit the statement to James
Coffey as an admission by an employee within the scope of his
employment, notwithstanding their inability to identify the
declarant more specifically.[14]

---

[14]This is not to say that, at trial, Dartmouth Hitchcock may
not make an issue of the lack of specificity, whether through its

Dartmouth Hitchcock further argues that the comment to James Coffey is inadmissible because the declarant "must have gotten the information--even if true--from some source other than their personal knowledge of [Coffey's] care." As just discussed, however, the declarant appeared to profess personal knowledge of Coffey's condition, saying "he had never seen anything like it." Regardless, as the plaintiffs point out, the declarant's personal knowledge of what he speaks is not essential to treating the statement as an admission. Fed. R. Evid. 801(d)(2) advisory committee's note (1972); see also Brookover v. Mary Hitchcock Mem'l Hosp., 893 F.2d 411, 415-18 (1st Cir. 1990).

Finally, Dartmouth Hitchcock objects that, even if the statement is admissible under Rule 801(d)(2)(D), it is "unduly prejudicial" and should therefore be excluded under Rule 403. The court disagrees. As discussed supra, Dartmouth Hitchcock

---

cross-examination of James or otherwise. Indeed, the plaintiffs had recourse to discovery mechanisms that presumably would have identified the declarant, e.g., asking Dartmouth Hitchcock to list and provide a photograph of all employees working in that area of the hospital at that time. While James's inability to remember much about the declarant is understandable, plaintiffs' counsel's failure to employ these discovery measures is less so; indeed, they conceded at oral argument that they essentially made no effort in that regard. Nevertheless, as one court has remarked in admitting a statement under similar circumstances, "[w]hile these deficiencies may very well make it more difficult for [the plaintiffs] to succeed at trial, they are not necessarily relevant to the question of whether the statements themselves are admissible." Becton, 491 F. Supp. 2d at 742.

intends to take the positions at trial that the glucose never infiltrated Coffey's tissue, and, moreover, that the hospital acted within the standard of care in administering the glucose. That gives the declarant's comment to Coffey that "it was an injection of D-50 into the tissue of her hand.  Someone had made a mistake" probative force as a "prior factual claim contradictory to a factual position taken in this case by the same party."  Trull v. Volkswagen of Am., Inc., 187 F.3d 88, 99 (1st Cir. 1999).  Furthermore, Dartmouth Hitchcock has the opportunity to staunch any prejudice by cross-examining James Coffey as to his hazy recollection, or through other methods, see note 13, supra.  Dartmouth Hitchcock's motion is denied as to this statement.

### B.    The statement to Mary Worley

Dartmouth Hitchcock also challenges a statement allegedly made to Coffey's daughter, Mary Worley, while she and other members of the family, including Coffey's husband, were in Coffey's hospital room after the injections had been given.  At her deposition, Worley testified that "a person--I don't know whether she was a nurse or a nurse's aide--went and looked out the door to see if anyone was looking around and then came back in and said, [']We're really concerned--they are really concerned

34

that your mother is going to lose her hand.[']"  While Worley

recalled that the person was wearing a uniform--"loose-fitting

pants with an overblouse"--Worley could not recall anything else

about her appearance, including her height, facial features, or

voice or the color of her uniform, her hair, or her skin.

Unlike the statement to James Coffey, the plaintiffs do not

seek to admit the statement to Worley for its truth, i.e., that

"they," presumably the responsible Dartmouth Hitchcock staff,

were concerned that Coffey would lose her hand.[15]  Instead, they

offer the statement for the emotional distress they say it

engendered in the plaintiffs who heard it, namely, Coffey and her

husband.  That resolves the hearsay problem, see Fed. R. Evid.

801(c), but potentially creates another difficulty:  whether the

plaintiffs can recover for the distress caused by a statement

attributed to a Dartmouth Hitchcock employee, as opposed to the

consequences of Dartmouth Hitchcock's alleged malpractice.

---

[15]While the plaintiffs' objection is somewhat ambiguous on
this point, they clarified it at oral argument.  In any event,
courts have generally upheld the exclusion of an employee's
statements about what "they"--presumably fellow employees
possessed of greater authority but otherwise unidentified--want
or believe as presenting an unresolved hearsay-within-hearsay
problem under Rule 805.  See, e.g., Zaben v. Air Prods. & Chems.,
Inc., 129 F.3d 1453, 1456-57 (11th Cir. 1997); Carden v.
Westinghouse Elec. Corp., 850 F.2d 996, 1002 (3d Cir. 1988);
Cedeck v. Hamiltonian Fed. Sav. & Loan Ass'n, 551 F.2d 1136, 1138
(8th Cir. 1977).

In the court's view, the answer to this question depends on the identity of the particular plaintiff.  New Hampshire law allows recovery under the wrongful death statute, RSA 556:12, I, "for any conscious pain and suffering endured by the decedent in anticipation of the fatal accident," including "pre-accident fright."  Thibeault v. Campbell, 136 N.H. 698, 702 (1993).  It seems obvious that the alleged comment to Worley would have contributed to Coffey's consciousness of her plight, and is therefore admissible on that point--assuming, of course, that Coffey heard the comment.  The materials presently before the court give no indication that she did; the excerpt of Worley's deposition transcript submitted to the court suggests only that the comment was made in Coffey's hospital room.  Without filling this gap in the foundation--which they may be able to do at trial--the plaintiffs cannot offer the statement to Worley for the emotional distress it caused Coffey.

The emotional distress of Coffey's husband, however, is a different matter.  As referenced supra, the third amended complaint had asserted two claims on his behalf, loss of consortium and negligent infliction of emotional distress.  The loss of consortium count alleged that, "[a]s a result of the injuries suffered by his wife, Mr. Coffey has been deprived of the care, comfort and society of his wife for which he is

36

entitled to be fairly compensated." The negligent infliction of emotional distress count, in contrast, alleged that Coffey was aware that his wife had been injured and, indeed, observed her "deteriorate physically and emotionally" while she received treatment for her injuries. "As such," that count concludes, "Mr. Coffey suffered the sensory and contemporaneous experience of his wife being injured by [Dartmouth Hitchcock's] conduct," causing him emotional trauma and distress.

If Francis Coffey overheard the comment to Worley, as the plaintiffs have represented he did, it certainly would have contributed to the emotional distress of his ordeal in watching his wife suffer. But Francis Coffey has voluntarily dismissed the vehicle for recovering that emotional distress, namely, his claim for negligent infliction of emotional distress. See Graves v. Estabrook, 149 N.H. 202, 203 (2003). So the statement is not admissible on that theory.

The plaintiffs have maintained, both at oral argument and in a supplemental brief filed afterwards, that Francis Coffey may recover for emotional distress under his loss of consortium theory. That is correct, but the emotional distress recoverable under a loss of consortium theory is of a different kind, namely, the emotional distress resulting from the effect of his wife's injuries and ultimately her death on, as the third amended

complaint asserts, "the care, comfort and society" she was able to give him.  See LaBonte v. Nat'l Gypsum Co., 113 N.H. 678, 683 (1973); see also RSA 556:12, II (recognizing loss of consortium claim for death of one's spouse).  The comment to Worley that (presumably) hospital staff were "really concerned that [Coffey] [was] going to lose her hand" did not cause Coffey's injuries and therefore had no effect on the consortium she could provide her husband.  It is therefore irrelevant to the loss of consortium claim because it does not have "any tendency to make the existence of any fact that is of consequence to the determination of the action"--here, the emotional distress Francis Coffey suffered from losing the care, comfort, and society of his wife through her injuries and death--"more probable or less probable than it would be without the evidence."  Fed. R. Evid. 401. Again, the emotional distress Francis Coffey suffered from watching his wife's own suffering is recoverable only under a negligent infliction of emotional distress theory.

The plaintiffs have provided no authority for their view that the emotional distress recoverable under a loss of consortium theory embraces the effect of the defendant's statements on the claimant spouse.  Dartmouth Hitchcock's motion to exclude the statement to Worley, then, is granted without

prejudice to the plaintiffs' ability to show at trial that Coffey in fact overheard it.

## III. Conclusion

For the foregoing reasons, the plaintiffs' second, fourth, and fifth motions in limine[16] are GRANTED; the plaintiffs first and third motions in limine[17] are DENIED; Dartmouth Hitchcock's first motion in limine[18] is DENIED; and Dartmouth Hitchcock's second motion in limine[19] is DENIED IN PART AND GRANTED IN PART, all as more fully set forth supra.

**SO ORDERED.**

_____
Joseph N. Laplante
United States District Judge

Dated:  May 1, 2009
cc:  Gary B. Richardson, Esq.
     Heather M. Burns, Esq.
     Philip M. Coffin, III, Esq.
     Thomas V. Laprade, Esq.
     Charlene Desrochers
     Erland C.L. McLetchie, Esq.
     The Honorable Robert E.K. Morrill
     Joseph Pepe, M.D.

---

[16]Document nos. 55, 57, and 66.

[17]Document nos. 54 and 56.

[18]Document no. 61.

[19]Document no. 62.

39